IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

PRINCETON PAYMENT SOLUTIONS, )
LLC,                          )
    Plaintiff,            )
                      )       Case No. 1:13-cv-852
        v.               )
                      )
ACI WORLDWIDE, INC., *et al.*, )
    Defendants.           )

## MEMORANDUM OPINION

This is a software copyright infringement action.  At issue on summary judgment are the following questions:

1. Whether plaintiff has standing to sue for copyright infringement of certain copyrighted computer software programs where, as here, the software was developed by an independent contractor who did not assign her rights to plaintiff until after the commencement of this suit;

2. Whether the independent contractor's failure to assign her copyrights to plaintiff until after the commencement of this suit is remedied by an assignment—labeled "*nunc pro tunc*"—that purports to effect a retroactive assignment of the copyrights to plaintiff;

3. Whether creation of temporary copies of computer software on plaintiff's server's "random access memory" constitutes an "essential step" pursuant to 17 U.S.C. § 117(a), thereby shielding defendant from suit for copyright infringement of that software; and

4. Whether the sale of one defendant's stock to a second defendant operated as an unauthorized assignment of a computer software license agreement between plaintiff and the first defendant, thereby constituting a breach of that agreement so as to deprive the first defendant of the right to use the computer software.

I.

The summary judgment record reflects the following undisputed facts.

Plaintiff Princeton Payment Solutions, LLC (DE) (referred to throughout as "PPS (DE)")

is a Delaware corporation that creates software to assist its clients in processing credit card

transactions. PPS (DE) is a successor in interest to Princeton Payment Solutions, LLC (NJ) (referred to throughout as "PPS (NJ)"). PPS (NJ) and PPS (DE) are referred to collectively as "PPS." In 2013, PPS was acquired by, and is currently a division of, Financial Transaction Services (now CardConnect), a provider of secure payment processing and technology services.

Defendant Princeton eCom Corporation ("PeCom") is an electronic payments provider for financial institutions and billers. Defendant Online Resources Company ("ORCC") is a corporation providing online banking and bill paying services. In 2006, ORCC acquired PeCom through an all-cash merger. Defendant ACI Worldwide, Inc. ("ACI") is also a corporation providing online banking and bill paying services. In 2013, ACI acquired ORCC by purchasing all of ORCC's stock. Defendants will be referred to individually as ACI, ORCC, and PeCom, and collectively as "defendants."

One of the services provided by ORCC to its customers is the Electronic Bill Presentment and Payment ("EBPP") service. This service is accomplished via software that allows ORCC's customers to deliver electronic bills and receive electronic bill payments. During the times relevant to this suit, EBPP was accomplished using two software programs. One of the software programs—Payware software—was owned by VeriFone, Inc. The second software program was Middleware software, which was sold by PPS to ORCC. Middleware software, which was designed to be used in conjunction with Payware, acted as a "connector" to Payware, allowing Payware to communicate with credit card processors. It is the copyrights pertaining to Middleware software for certain periods of time that are at issue in this case.

On October 16, 2003, ORCC's predecessor, PeCom, signed a Professional Service Agreement with PPS (NJ) regarding Payware and Middleware software ("the 2003 PSA"). The 2003 PSA provided that PPS (NJ) would furnish PeCom with the Payware and Middleware software in return for a fee. The 2003 PSA further provided that the agreement would expire

2

upon performance by PPS (NJ) of the first "Statement of Work" between PPS and PeCom, which the record reflects occurred sometime in 2003.[1]  Consistent with the terms of the 2003 PSA, PPS sent ORCC a letter shortly before the commencement of this suit in 2013 stating, "The [2003 Professional Services Agreement] has now expired in accordance with Section 7.1 of such agreement."[2]  Section 7.1 of the 2003 PSA states that the 2003 PSA will terminate upon completion of the first Statement of Work between PPS (NJ) and PeCom.  The 2003 PSA did not provide for a renewal term.

In 2006, ORCC acquired PeCom through an all-cash merger.  Following the merger, PPS continued to provide Payware and Middleware software to ORCC.  Over the next seven years, PPS and ORCC entered into over a dozen Statements of Work, each of which provided that ORCC would pay PPS a one-time fee for the creation, installation, and use of a new version of the Middleware software.  The record includes only Statements of Work from 2008 to 2012, which reflect that ORCC paid PPS one-time fees for various versions of Middleware software totaling $205,812.50.[3]

All versions of the Middleware software provided to ORCC were created by Marilee Thompson, an independent contractor working for PPS.  Ms. Thompson customized each

---

[1] The Statements of Work referenced throughout are contractual agreements between PPS and defendants, which provided that defendants would pay PPS fees in return for installation and use of the software at issue.

[2] *Princeton Payment Solutions, LLC v. ACI Worldwide, Inc., et al.*, Case No. 1:13-cv-852, Doc. 37, Ex. 31 (E.D. Va. Dec. 16, 2013).

[3] This amount reflects the invoices paid for the twelve Statements of Work for the period from 2008-2012.  An internal e-mail between PPS employees states, "What we do know…is that we have billed ORCC roughly $2.35 million over the past 12 years…roughly 200k per year over the life of the relationship in order to build this product & 95k annually to support it."  *Princeton Payment Solutions, LLC v. ACI Worldwide, Inc., et al.*, Case No. 1:13-cv-852, Doc. 37, Ex. 44 (E.D. Va. Dec. 16, 2013).

specific version of the Middleware software to suit ORCC's particular needs, and she installed

each version of the software on ORCC's servers. PPS gave Ms. Thompson, the sole drafter of

the software, free reign over how she would write the code for the Middleware software,

provided the software met ORCC's needs. ORCC paid annual support and maintenance fees to

PPS in exchange for Ms. Thompson's continuing technical support on the Middleware software.

In 2012, after PPS was purchased by venture capitalists at Financial Transaction Services,

PPS gave notice to all of its clients, including ORCC, that PPS would no longer provide Payware

and Middleware software or software upgrades, nor would PPS continue to provide technical

support on those products. PPS further notified ORCC that all technical support on Payware and

Middleware software would end as of October 31, 2013. In lieu of Payware and Middleware

software, PPS introduced a new product called CardConnect, which performs the same functions

as Payware and Middleware combined. Thereafter, ORCC and PPS entered into negotiations for

ORCC to migrate from Payware and Middleware to the new CardConnect program.

In February 2013, PPS and ORCC agreed in principle for ORCC to migrate to

CardConnect. But before an agreement could be signed, PPS learned that ACI, a company

providing similar services as PPS, would be acquiring ORCC's stock. PPS then reviewed

ORCC's previous agreements with PPS, including the many Statements of Work, and concluded

that PPS had not explicitly authorized PeCom's transfer of the 2003 PSA to ORCC when ORCC

purchased PeCom in 2006. Specifically, PPS focused on Provision 8.4 of the 2003 PSA, the

anti-assignment covenant, which provided that PeCom was precluded from assigning the

agreement, either directly or in connection with a change of control, without PPS's express

written permission. Based on this information, PPS further concluded that ORCC never had any

rights to use the Middleware software that PPS had provided to ORCC from 2006 and 2013,

despite the Statements of Work that PPS and ORCC had entered into for creation, installation,

4

and use of various versions of Middleware software, and despite the substantial fees ORCC had

paid PPS during this period for use of the Middleware software.  Accordingly, PPS demanded

that ORCC agree to a seven-year commitment to CardConnect for a yearly price that was nearly

twenty times what ORCC had been paying to PPS during the past seven years for use of the

Payware and Middleware software.  ORCC declined this demand.  Then, on March 11, 2013,

ACI purchased ORCC's stock.  Subsequently, ORCC informed PPS that it would not migrate to

the CardConnect software, and that ORCC would instead use ACI's software, Postilion, to

replace the Payware and Middleware software.  It is undisputed that ACI, ORCC, and PeCom no

longer use Middleware software.

On July 10, 2013, PPS filed the eleven copyright applications relevant to this case.  Each

application claimed one of the versions of the Middleware software created by PPS's

independent contractor, Ms. Thompson, and referenced in various Statements of Work between

PPS and ORCC from August 4, 2008 to September 14, 2012.[4]  Five days later, on July 15, 2013,

PPS filed suit, alleging that ORCC had infringed on those eleven copyrights.

PPS claims that ORCC's right to use various versions of Middleware software stems

solely from the 2003 PSA between PeCom (ORCC's predecessor) and PPS.  Because the anti-

---

[4] The relevant eleven copyrights filed by PPS on July 10, 2013 claimed the following versions of
Middleware software:

1. "Chase Paymentech back end," created August 11, 2011.
2. "Elavon back end," July 15, 2011;
3. "First Data Atlanta back end," created August 12, 2012;
4. "First Data Nashville back end," created March 24, 2011;
5. "First Data North back end," created September 17, 2011;
6. "First Data Star back end," created September 14, 2012;
7. "Global East back end," created August 27, 2011;
8. "Litle back end," created January 5, 2010;
9. "TSYS back end," created August 27, 2011;
10. "Vantiv back end," created August 4, 2011;
11. "Web/Batch front end," created August 4, 2008.

assignment covenant in the 2003 PSA to ORCC precluded PeCom from assigning the 2003 PSA without the express permission of PPS, and because ORCC acquired PeCom in 2006 but PeCom was never given written permission to assign the 2003 PSA to ORCC, PPS claims that ORCC breached the 2003 PSA. PPS claims that, as a result of this breach, ORCC never obtained the right to use various versions of the Middleware software from 2006-2013. Alternatively, PPS claims that the 2003 PSA actually remained in force after PeCom was acquired by ORCC, but that ORCC's acquisition by ACI triggered the anti-assignment covenant. Thus, PPS claims that ORCC's use of the software since ORCC's acquisition in 2013 by ACI infringed PPS's copyrights because PPS never gave ORCC permission to assign the 2003 PSA to ACI.[5]

For their part, defendants claim that PPS does not have standing to bring suit for copyright infringement, because an independent contractor created the various versions of Middleware software at issue and never assigned the rights to that software to PPS until after commencement of this lawsuit. Alternatively, defendants claim that even if PPS has standing to sue for copyright infringement of the eleven versions of Middleware software, defendants' use of the software did not constitute infringement because that use was an "essential step" pursuant to 17 U.S.C. § 117(a). Finally, defendants claim that, even if PPS has standing to sue, and even if defendants' use of the Middleware software was not an "essential step," the 2003 PSA does not control the relationship between PPS and ORCC because that agreement expired in 2003, long before ORCC acquired PeCom. Moreover, defendants claim that ORCC had the right to use the Middleware software pursuant to the Statements of Work entered into between PPS and ORCC, for which ORCC paid PPS substantial fees.

---

[5] PPS's originally claimed that ORCC used the Middleware software without permission from 2006-2013. Yet, it now appears that PPS claims only that ORCC infringed PPS's copyrights since ACI's acquisition of ORCC in 2013.

## II.

Summary judgment is appropriate when the record shows that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether any genuine issue of material fact exists, all facts and reasonable inferences must be drawn in the light most favorable to the non-moving party. Yet, the mere existence of a factual dispute will not preclude summary judgment, as the non-moving party must show that the factual dispute is genuine or material to the case. *Id.* at 247-48. In other words, the factual dispute must affect the substantive outcome of the case, and the non-movant must adduce sufficient admissible evidence to allow a reasonable trier of fact to find for the non-moving party. *Id.* If the evidence favoring the non-moving party is "merely colorable, or is not sufficiently probative, summary judgment must be granted." *Id.* at 249-50. Mere conclusory statements, or affidavits that recite conclusory allegations, are not enough to survive a motion for summary judgment. *Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411-12 (4th Cir. 1986).

## III.

A plaintiff claiming copyright infringement must establish "ownership of the copyright by the plaintiff and copying by the defendant." *Keeler Brass Co. v. Cont'l Brass Co.*, 862 F.2d 1063, 1065 (4th Cir. 1988). Here, PPS alleges (1) that the eleven copyright applications filed on July 10, 2013, all of which claim versions of Middleware software in issue here, are adequate to prove PPS's ownership of the copyrights, and (2) that ORCC copied those versions of the Middleware software when ORCC ran the Middleware software on its own servers, inasmuch as temporary random access memory ("RAM") copies of Middleware software were created on ORCC's servers each time the servers ran the software.

## A. Ownership of the Copyrights

Analysis of whether PPS actually owned copyrights to the Middleware software in issue

for the time period involved properly begins with the statute's clear terms. Under 17 U.S.C. §

501(b), a party may only sue for copyright infringement if the party owned the copyright at the

time the alleged infringement occurred.[6]   In other words, PPS only has standing to sue for

copyright infringement of the Middleware software if it owned those rights at the time ORCC

allegedly used the software without the right to do so.  To be sure, the record reflects that PPS

possesses certificates of registration issued by the Copyright Office for the software programs at

issue. A certificate of registration issued by the Copyright Office is "prima facie evidence of the

validity of the copyright and of the facts stated in the certificate," such as ownership.  17 U.S.C.

§ 410(c). But this does not end the analysis, for as courts have recognized, the Copyright

Office's well-known "practice of summarily issuing registrations...counsels against placing too

much weight on registrations as proof of a valid copyright." *Universal Furniture Intern., Inc v.

Collezione Europa USA, Inc.*, 618 F.3d 417, 428 (4th Cir. 2010).[7]   Accordingly, reviewing courts

must consider and assess other relevant indicia of ownership, such as the parties' intent and the

terms of transfer agreements and other documents establishing a chain of title. *Id.*

---

[6] "The legal or beneficial owner of an exclusive right under a copyright is entitled...to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b). *See also Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) (explaining that the elements of a copyright infringement claim are (i) ownership of a valid copyright and (ii) copying of constituent elements of the work that are original).

[7] See also *M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 434 (4th Cir. 1986) (explaining that the evidence of copyright certificates merely shifts the burden to the defendant to prove that the copyright is invalid or that the facts stated in the certificate are untrue).

As the undisputed record reflects, at the time the alleged copyright violations occurred, PPS had not yet filed copyright applications for the eleven versions of Middleware Software at issue. Also clear from the undisputed record is that the versions of Middleware software at issue were created long before PPS filed its copyright applications. Moreover, PPS itself was not responsible for creating the Middleware software. Instead, PPS hired an independent contractor, Ms. Thompson, to write the code for all versions of the software in dispute. It is also undisputed that Ms. Thompson was in complete control of writing the computer code as she saw fit, provided only that the software met ORCC's needs. Moreover, it is further undisputed that Ms. Thompson was the sole author of the software. From these facts, it follows that ownership of the Middleware software code vested originally in Ms. Thompson, who was the author of the work.[8] Because there is no evidence of any contemporaneous agreement between Ms. Thompson and PPS that assigned the rights to the Middleware software at issue to PPS during the time the alleged copyright violation occurred, PPS lacks standing to sue for copyright infringement.

Seeking to avoid this result, PPS relies on the following two agreements to establish ownership of the copyrights sufficient to establish standing:

1. A 2003 Consulting Agreement between Ms. Thompson and PPS (NJ), which provides that Ms. Thompson assigned all of her copyright interests in the Middleware Software to PPS (NJ). This agreement has a termination date of March 5, 2004, before any of the work at issue was created. There is no renewal

---

[8] Because it is undisputed that Ms. Thompson is an independent contractor for PPS—not an employee—the Middleware software that she wrote is not a "work made for hire" as defined by the Copyright Act. The ownership of a work made for hire vests in the employer of the employee who created the work. 17 U.S.C. § 201(b). In contrast, a work created by an independent contractor belongs to the independent contractor, not to the entity with whom the independent contractor contracted. *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989). The only exception to that rule is if the work is "commissioned for use as a contribution to a collective work, as part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional test, as an answer material for a test, or as an atlas." 17 U.S.C. § 101(2). The plaintiff does not argue that the Middleware software falls into that exception.

provision in the agreement. PPS claims that this agreement is still in force based on a "Confirmatory *Nunc Pro Tunc* Assignment" signed by Ms. Thompson and PPS on November 21, 2013 after PPS filed suit against defendants. This 2013 *Nunc Pro Tunc* Agreement states that the 2003 Consulting Agreement actually extends until February 12, 2012.

2. A February 14, 2012 Consulting Agreement signed between PPS (DE) and Ms. Thompson. This new Consulting Agreement contained language that assigned to PPS (DE) any and all of Ms. Thompson's copyright interests in works authored by her from February 14, 2012 until December 31, 2012.

PPS's reliance on these two agreements to remedy its lack of standing is unavailing. For the reasons that follow, is clear that the 2003 Consulting Agreement and 2013 *Nunc Pro Tunc* Agreement conferred no rights on PPS for the Middleware software at issue, and the 2012 Consulting Agreement transferred to PPS the rights at most to only one version of the Middleware software to PPS—the "First Data Star back end," created July 12, 2012.

**2003 Consulting Agreement and 2013 *Nunc Pro Tunc* Agreement**

The threshold issue regarding interpretation of the 2003 Consulting Agreement is choice of law, which must be addressed notwithstanding the parties' silence on the issue. The 2003 Consulting Agreement has a choice of law provision designating California, and thus, California law governs interpretation of the 2003 Consulting Agreement. It is well-settled under California law that interpretation of a contract "must give effect to the mutual intention of the parties…at the time the contract is formed." *MacKinnon v. Truck Ins. Exchange*, 31 Cal.4th 635, 647 (2003). The intention of the parties "is to be inferred, if possible, solely from the written provisions of the contract." *Id.*[9]

---

[9] This principle is hardly unique to California law; indeed, it is a well-recognized canon of American contract law. *See also* 4B Michie's Jurisprudence, Contracts § 45 (explaining that parties to a contract are presumed to have meant what their agreement clearly states, and "where parties have elected to put an agreement in writing, the words of the agreement control").

Here, the mutual intention of the parties at the formation of the 2003 Consulting Agreement is clear from the agreement's plain terms. The 2003 Consulting Agreement, which assigns to PPS the rights to Ms. Thompson's authored work, states, "The 'Period of Consultancy' shall commence on March 5, 2003 and shall terminate on March 5, 2004." No language in the 2003 Consulting Agreement states or suggests that the parties intended the agreement to extend past this stated termination date, and there is no evidence that the parties ever amended the 2003 Consulting Agreement.

Obviously recognizing this deficiency, PPS, after filing this case, entered into the so-called 2013 *Nunc Pro Tunc* Agreement with Ms. Thompson, and PPS claims that this *nunc pro tunc* agreement retroactively confers standing upon PPS to sue for infringement of the copyrighted software. The 2013 *Nunc Pro Tunc* Agreement states that—despite the 2004 expiration date of the 2003 Consulting Agreement—the parties actually intended the 2003 Consulting Agreement to extend until February 12, 2012. But PPS's attempt to rewrite history by labeling the 2013 agreement to be effective *nunc pro tunc* cannot rescue PPS from its standing predicament, for it is sensibly settled that standing "may not be retroactively created...[where it] did not exist at the outset." *Splitfish AG v. Bannco Corp.*, 2010 WL 9010837 (E.D. Va. July 8, 2010) (*citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 571 (1992)). In other words, "well-settled jurisdictional principles preventing retroactive creation of standing" foreclose PPS's argument that a *nunc pro tunc* agreement alone can retroactively confer rights when an earlier agreement did not. *Id.*[10] The Federal Circuit explained this point persuasively in *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093-94 (Fed. Cir. 1998). There, a party

---

[10] *See also Davis v. Blige*, 505 F.3d 90, 101 (2d Cir. 2007) (holding that retroactive copyright transfers or assignments are invalid because permitting them could extinguish a co-owner's accrued infringement claim).

claiming patent infringement argued that a license agreement, created in 1993 but made effective *nunc pro tunc* to 1992, rendered the party an assignee for the purposes of standing to sue for infringement. The Federal Circuit rejected the party's argument, making clear that *nunc pro tunc* assignments are not sufficient to confer retroactive standing. In reaching this conclusion, the Federal Circuit noted the difficulties that a contrary conclusion would entail:

> Permitting non-owners and licensees the right to sue, so long as they eventually obtain the rights they seek to have redressed, would enmesh the judiciary in abstract disputes, risk multiple litigation, and provide incentives for parties to obtain assignments in order to expand their arsenal and the scope of litigation. Inevitably, delay and expense would be the order of the day.

*Id.* at 1093-94 (internal citations omitted). In sum, PPS's attempt to backdate the 2003 Consulting Agreement through the use of a *nunc pro tunc* label does not confer on PPS standing to sue for infringement of Middleware software created by Ms. Thompson after the 2003 Consulting Agreement expired in March 2004.

**2012 Consulting Agreement**

The 2012 Consulting Agreement between PPS and Ms. Thompson assigns to PPS all of the copyright interests in works authored by her from February 14, 2012 until December 31, 2012. But this agreement has limited relevance in the instant case because it assigns, at most, the rights to only one of the eleven copyrights at issue—the "First Data Star back end," created July 12, 2012.

Nine of the eleven copyright applications filed by PPS in July 2013 are for works created and delivered to ORCC before 2012. Thus, those nine copyrights are not covered by the 2012 Consulting Agreement, which only covers works created by Ms. Thompson during the period from February 24, 2012 until December 31, 2012. Moreover, the Statement of Work corresponding to one of the remaining copyright applications—the copyright application filed on August 12, 2012—indicates that the copyrighted version of the Middleware Software was

12

created by Ms. Thompson and delivered to ORCC in 2011, and thus is not covered by the 2012 Consulting Agreement. Only one copyright is potentially covered by the 2012 Consulting Agreement—the copyright application filed on September 14, 2012. This copyright application corresponds to three separate Statements of Work and thus three separate versions of the Middleware software. The Statements of Work corresponding to two versions of Middleware software state that the versions of the software were created prior to 2012 and thus not covered by the 2012 Consulting Agreement. However, the third Statement of Work—Statement of Work 2012-076—corresponds to a version of Middleware software created July 12, 2012, which is during the period covered by the 2012 Consulting Agreement. At most, therefore, the 2012 Consulting Agreement gives PPS standing to sue for infringement of only one copyright—the copyright application filed on September 14, 2012.

### B. Copying by the Defendant

The second issue is whether ORCC actually copied the Middleware software. Here, PPS claims that ORCC created "copies" of Middleware software, as defined by the Copyright Act, because temporary RAM copies of Middleware software were created on ORCC's servers each time the software was run on the servers.[11] Defendants claim that, even assuming PPS owns the copyrights to the Middleware software at issue, any temporary RAM copies of the Middleware

---

[11] This assumes, as some courts have held, that RAM copies of software constitute copies pursuant to the Copyright Act. *See Quantum Systems Integrators, Inc. v. Sprint Nextel Corp.*, 338 Fed. Appx. 329 (4th Cir. 2009) (stating that the infringement of the plaintiff's software "consisted of RAM copies that were automatically generated"); *Stenograph L.L.C. v. Bossard Associates, Inc.*, 144 F.3d 96 (D.C. Cir. 1998) (stating that "the loading of software…to the computer's random access memory…causes a copy to be made"); *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993) ("[C]opying for purposes of copyright law occurs when a computer program is transferred from a permanent storage device to a computer's RAM."); *Advanced Computer Services of Michigan, Inc. v. MAI Systems Corp.*, 845 F.Supp. 356 (E.D. Va. 1994) (concluding that RAM copies of a program are sufficiently fixed to be a "copy" protected by the Copyright Act).

software created by ORCC on its servers fall under the protection of 17 U.S.C. § 117(a)—the "essential step" defense—which provides that copying a protected computer software program is not an infringement if creating that copy is an "essential step in the utilization" of the software. 17 U.S.C. § 117(a).[12] In other words, defendants are entitled to the protection of § 117(a) if the record reflects (1) that ORCC actually owned copies of the Middleware software, and (2) that the temporary RAM copies of the software created on ORCC's servers constitute "essential step[s] in the utilization" of the software. If ORCC actually owned the copies of the Middleware software at issue, and if the temporary RAM copies of the Middleware software constitute an essential step in utilizing that software, then defendants did not infringe PPS's copyrights.

First, it is clear that ORCC owned the copies of the software at issue. Ownership of a copy is distinct from copyright ownership.[13] For example, "the author of a book, or her assignee, ordinarily owns the copyright in the book and thus the sole right to authorize copying; each purchaser of a copy of the book owns that copy, but is generally not entitled to make copies from it." *Krause v. Titleserv, Inc.*, 402 F.3d 119, 122 (2d Cir. 2005). Although the Fourth Circuit has not announced a test for copyright ownership under § 117, the Second Circuit's reasoning in *Krause v. Titleserv, Inc.*, is persuasive. In that copyright case, the Second Circuit reasoned that the protections of § 117(a) are not limited only to those possessing formal title. Instead, "courts should inquire into whether the party exercises sufficient incidents of ownership

---

[12] "Notwithstanding the provisions of section 106 [which generally provides, *inter alia*, that copying of a protected work is an infringement], it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided...that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner." 17 U.S.C. § 117(a).

[13] *See* 17 U.S.C. § 202 ("Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied.").

over a copy of the program to be sensibly considered the owner of the copy for purposes of § 117(a)." *Id.* at 124. The party may still be protected by § 117(a), despite lacking formal title, if the party "enjoys sufficiently broad rights over [the copy of the program] to be sensibly considered its owner." *Id.*

Here, the following factors are strong evidence of ORCC's ownership of the Middleware software copies:

1. ORCC paid PPS substantial amounts of money—at least over $200,000—to develop the versions of the software programs for ORCC's sole benefit.

2. PPS, through its independent contractor, customized the software programs to serve ORCC's operations.

3. The software was installed on ORCC's servers.

4. The Statements of Work do not state that PPS reserved the right to repossess the copies used by ORCC. In fact, none of the Statements of Work have a termination date for any of the copies of the software.

5. The Statements of Work do not restrict ORCC's use of the copies. ORCC was free to discard or destroy the copies any time it wished to do so.

As the Second Circuit stated, "it seems anomalous for a user whose degree of ownership of a copy is so complete that he may lawfully use it and keep it forever, or if so disposed, throw it in the trash, to be nonetheless unauthorized" to modify or copy the software if necessary to make the software useable. *Id.* at 123. Thus, these incidents of ownership suffice to show that ORCC did not merely possess copies of the Middleware software, but instead owned these copies.

Furthermore, it is clear that the temporary RAM copies of the software created by ORCC each time the software was run constitutes an "essential step" in utilizing ORCC's copies of the software. Creation of temporary RAM copies was actually necessary for ORCC to utilize the software. Again, the Fourth Circuit has not yet addressed whether RAM copies constitute essential steps, but the Second Circuit's reasoning on this point is also persuasive. In *Krause*, the

Second Circuit explained that the "essential step" test is met where the copies or adaptations at issue were "essential to allow use of the program[s] for the very purpose for which they were purchased." *Krause*, 402 F.3d at 125 (citations omitted).  The adaptations of the software found by the Second Circuit to be "essential steps" were (1) fixing "bugs" in the computer program, (2) changing source code to add new clients and client information, (3) incorporating the computer programs into Titleserv's Windows-based computing system, and (4) adding capabilities to the computer programs such as the ability to print checks. *Id.* at 125–26.  The Second Circuit found these modifications essential not because they were "truly necessary to the functioning of the system," but because they were necessary to make the software worth using. *Id.* at 126–27.[14]

Here, the copies at issue—temporary copies of the Middleware software code on volatile RAM—were actually necessary to run and use the software.  In other words, creation of the RAM copies went a step beyond the standard explained by the Second Circuit in *Krause*, because these RAM copies were not just useful, but indeed essential.  Temporary RAM copies, which are erased when the computer shuts down or restarts, or when the program is exited, enabled the Middleware software to function.[15]  Thus, because creation of RAM copies is an

---

[14] *See also Allen–Myland, Inc. v. International Business Machines Corp.*, 746 F. Supp. 520, 536 (E.D. Pa. 1990) ("§ 117(1) permits only the copying of a program into a computer's memory in order to permit the computer to execute the program."); *Midway Mfg. Co. v. Strohon*, 564 F.Supp. 741, 745 n. 2 (N.D. Ill. 1983) (holding that § 117(a) is intended to permit owners of copies to make the programs compatible with their computer hardware or systems).

[15] It is clear that RAM copies enable software to function on a computer.  Computer memory is subdivided into CPU registers, cache memory (consisting of RAM), primary memory (consisting of RAM), and secondary or mass memory (e.g., hard drives and Read Only Memory).  Software is stored in secondary memory when installed on a computer, but programs must be in primary memory when the CPU needs to access them.  Thus, portions of the program are copied from secondary memory to RAM when the CPU needs to run the programs.  Because the data stored on RAM is stored electronically, not magnetically as on a hard drive, the data stored on RAM is lost once the computer is turned off or the program is quit.  Each portion of the computer program lasts only as long as it is in immediate use.  Thus, the transient nature of RAM

essential step to using copies of Middleware software owned by ORCC, PPS's claims for copyright infringement fail.

## IV.

Even assuming, *arguendo*, that PPS owned the rights to the eleven versions of the Middleware software at the time of the alleged copyright infringement, and even assuming the temporary RAM copies of the Middleware software created on ORCC's servers do not constitute an "essential step" under 17 U.S.C. § 117(a), PPS's claims for copyright infringement still fail because the 2003 PSA between PeCom and PPS expired in 2003 and thus never controlled the relationship between ORCC and PPS. In other words, ORCC's use of the Middleware software was not restricted by the fact that PeCom never assigned the expired 2003 PSA to ORCC.

PPS claims that ORCC's stock sale to ACI in 2013 acted as an unauthorized assignment of the 2003 PSA between PeCom and PPS, thus breaching the 2003 PSA and depriving ORCC of the rights to use the software. This claim fails. The 2003 PSA, originally drafted by PPS in 2003, states in Section 7.1 that the 2003 PSA was to expire as soon as the first Statement of Work was completed by PPS in 2003.[16] Thus, the 2003 PSA does not control the relationship between ORCC and PPS for the period in question—2006 to 2013—because it expired in 2003, three years before ORCC acquired PeCom.

PPS further claims that, if the 2003 PSA did expire in 2003, then ORCC had no rights to the Middleware software that ORCC used from 2006-2013. Such a claim is unsupported by undisputed record evidence. Over the course of seven years, PPS and ORCC entered into over a

distinguishes it from fixed storage. Sajjan G. Shiva, *Computer Organization, Design, and Architecture* 425-428 (4th ed. 2008).

[16] Section 7.1 of the 2003 PSA states, "This Agreement shall...continue in full force and effect for a period of until the professional services set forth on Exhibit 'A' are performed, unless terminated in accordance with the express provisions of this Agreement." Section 7.2 further explains that "All provisions of this Agreement shall expire as of the termination hereof."

dozen Statements of Work for the creation, installation, and use of versions of Middleware software installed by PPS on ORCC's servers. Each version of the Middleware software was created specifically to suit ORCC's needs, and ORCC paid a fee for each version of the software. In fact, the record reflects that ORCC paid PPS over $200,000 for use and installation of the Middleware software. The Statements of Work contained no use restrictions or termination dates. The notion that defendants must now prove that ORCC had the right to use the software for which it paid PPS substantial consideration is meritless.

## V.

In sum, the undisputed record reflects that defendants are entitled to summary judgment on copyright infringement for the following reasons:

1. PPS owned the rights, at most, to only one version of Middleware software at issue at the time of the alleged copyright infringement. Thus, PPS does not have standing to sue on the remaining ten versions of Middleware software.

2. ORCC cannot be sued for copyright infringement for any version of the Middleware software because ORCC actually owned copies of the Middleware software at issue, and the creation of copies on ORCC's RAM constitutes an "essential step" as permitted by 17 U.S.C. § 117(a);

3. The 2003 PSA, which PPS alleges was assigned by ORCC to ACI without authorization when ACI acquired ORCC's stock, actually expired in 2003 before ORCC acquired PeCom. Thus, the alleged assignment of the 2003 PSA did not deprive ORCC of its rights to the Middleware software. Moreover, the Statements of Work entered into between ORCC and PPS over the course of seven years, and the substantial fees paid by ORCC to PPS, gave ORCC the rights to the copies of the Middleware software run on its servers.

Accordingly, summary judgment must be granted for defendants and against PPS.

An appropriate Order will issue.

Alexandria, Virginia
August 15, 2014

/s/

T. S. Ellis, III
United States District Judge

18